**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SATISH DOSHI, Individually and on Behalf of All Other Persons Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| GENERAL CABLE CORPORATION, GREGORY B. KENNY, and BRIAN J. ROBINSON, | ) ) ) ) |
| Defendants. | ) ) |

Civil Action No.:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Satish Doshi, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding General Cable Corporation ("General Cable" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all

persons other than Defendants who purchased General Cable securities between February 23, 2012 and February 10, 2016, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      General Cable is a global leader in the development, design, manufacture, marketing and distribution of copper, aluminum and fiber optic wire and cable products for use in the energy, industrial, construction, specialty and communications markets.  The Company additionally engages in the design, integration, and installation on a turn-key basis for products such as high and extra-high voltage terrestrial and submarine systems.

3.      General Cable was founded in 1992 and is headquartered in Highland Heights, Kentucky.  General Cable's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BGC."

4.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) General Cable paid millions of dollars in bribes to government officials in foreign countries, including Angola, Bangladesh, China, Egypt, Indonesia, India, and Thailand, in order to secure business; (ii) the foregoing conduct was in violation of the Foreign Corrupt Practices Act of 1997 (the "FCPA"); (iii) General Cable's revenues were therefore in part the product of illegal conduct, and, as such, subject to disgorgement and unlikely to be sustainable; (iv) the foregoing conduct, when it became known, would subject the Company to

significant regulatory scrutiny and financial penalties; and (v) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

5.    On September 22, 2014, General Cable disclosed that the Company was reviewing "payment practices," "the use of agents," and "the manner in which the payments were reflected on our books and records" in connection with General Cable's operations in Portugal, Angola, Thailand, and India.  General Cable advised investors that these issues "may have implications under" the Foreign Corrupt Practices Act.

6.    On this news, General Cable stock fell $0.93, or 4.68%, to close at $18.96 on September 22, 2014.

7.    On February 26, 2015, General Cable announced that in connection with a possible settlement of FCPA offenses, the Company expected to disgorge $24 million in profits from bribe-tainted sales in Angola.

8.    On February 10, 2016, post-market, General Cable reported that the Company had increased its disgorgement accrual for the potential FCPA settlement by $9 million to $33 million, after identifying "certain other transactions that may raise concerns".

9.    On this news, General Cable's share price fell $3.05, or 31.61%, to close at $6.60 on February 11, 2016.

10.    On December 29, 2016, The *Wall Street Journal* reported that General Cable had entered into a non-prosecution agreement with the U.S. Department of Justice, in which the Company "agreed to pay $75.8 million to settle allegations it paid bribes across Africa and Asia and . . . agreed to an additional $6.5 million penalty to settle accounting-related violations."  The article further stated that the Company's subsidiaries, "over a period of a dozen years, paid about $13 million to third-party agents and distributors," who in turn "paid bribes to government

officials in Angola, Bangladesh, China, Indonesia and Thailand to get business in violation of the Foreign Corrupt Practices Act."

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

14.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as the securities of General Cable are traded on the NYSE, located within this Judicial District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Plaintiff, as set forth in the attached certification, purchased General Cable securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant General Cable is a Delaware corporation with its headquarters located at 4 Tesseneer Drive, Highland Heights, KY 41076.  The common stock is traded on the NYSE under the ticker symbol "BGC."

18.     Defendant Gregory B. Kenny ("Kenny") has served at all relevant times as the Company's Chief Executive Officer and President.

19.     Defendant Brian J. Robinson ("Robinson") has served at all relevant times as the Company's Executive Vice President, Chief Financial Officer, and Treasurer.

20.     The Defendants referenced above in ¶¶ 18-19 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     General Cable is a global leader in the development, design, manufacture, marketing and distribution of copper, aluminum and fiber optic wire and cable products for use in the energy, industrial, construction, specialty and communications markets.  The Company additionally engages in the design, integration, and installation on a turn-key basis for products such as high and extra-high voltage terrestrial and submarine systems.

### Materially False and Misleading
### Statements Issued During the Class Period

22.     The Class Period begins on February 23, 2012, when General Cable filed an annual report on Form 10-K with the SEC, subsequently amended on March 1, 2013, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "2011 10-K").  For the quarter, General Cable reported net income of $4.5 million, or $0.09 per diluted share, on revenue of $1.37 billion, compared to net income of $35.1 million, or $0.66 per diluted share, on revenue of $1.36 billion for the same period in the prior year.  For

2011, General Cable reported net income of $66.0 million, or $1.23 per diluted share, on revenue of $5.87 billion, compared to net income of $69.5 million, or $1.31 per diluted share, on revenue of $4.86 billion for 2010.

23.    In the 2011 10-K, General Cable stated, in part:

***Our business is subject to the economic, political and other risks of maintaining facilities and selling products in foreign countries.***

During the year ended December 31, 2011, approximately 64% of our sales and approximately 77% of our assets were in markets outside of North America. Our operations outside of North America generated approximately 55% of our cash flows from operations during this period. Some of our facilities, in particular, certain locations such as Algeria, Angola, Egypt, India, Pakistan, the Philippines, Thailand, and Venezuela, among others, are at higher risk of being targets of economic and political destabilization, international conflicts, restrictive actions by foreign governments, nationalizations or expropriations, changes in regulatory requirements, the difficulty of effectively managing diverse global operations, terrorist activities, adverse foreign tax laws and the threat posed by potential pandemics in countries that do not have the resources necessary to deal with such outbreaks. Our financial results may be adversely affected by the enactment of exchange controls or foreign governmental or regulatory restrictions on the transfer of funds. In addition, negative tax consequences relating to the repatriation of certain foreign income may adversely affect our cash flows. Over time, we intend to continue to expand our foreign operations, which would serve to exacerbate these risks and their potential effect on our business, financial position and results of operations. Economic and political developments in the countries in which we have operations, including future economic changes or crises (such as inflation, currency devaluation or recession), government deadlock, political instability, political activism, terrorist activities, civil strife, international conflicts, changes in laws and regulations and expropriation or nationalization of property or other resources, could impact our operations or the market value of our common stock and have an adverse effect on our business, financial condition and results of operations.

. . .

***Compliance with foreign and U.S. laws and regulations applicable to our international operations, including the Foreign Corrupt Practices Act ("FCPA") and other applicable anti-corruption laws, may increase the cost of doing business in international jurisdictions.***

Various laws and regulations associated with our current international operations are complex and increase our cost of doing business. Furthermore, these laws and

regulations expose us to fines and penalties if we fail to comply with them. These laws and regulations include import and export requirements, U.S. laws such as the FCPA, and local laws prohibiting payments to governmental officials and other corrupt practices. Although we have implemented policies and procedures designed to ensure compliance with these laws, there can be no assurance that our employees, contractors and agents will not take actions in violation of our policies, particularly as we expand our operations through organic growth and acquisitions. Any such violations could subject us to civil or criminal penalties, including substantial fines or prohibitions on our ability to offer our wire and cable products in one or more countries, and could also materially damage our reputation, brand, international expansion efforts, business and operating results. In addition, if we fail to address the challenges and risks associated with our international expansion and acquisition strategy, we may encounter difficulties implementing our strategy, which could impede our growth or harm our operating results.

24.     The 2011 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2011 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.     On May 4, 2012, General Cable filed a quarterly report on Form 10-Q with the SEC, subsequently amended on March 1, 2013 and on January 21, 2014, announcing the Company's financial and operating results for the quarter ended March 30, 2012 (the "Q1 2012 10-Q").  For the quarter, General Cable reported net income of $22.8 million, or $0.45 per diluted share, on revenue of $1.43 billion, compared to net income of $38.3 million, or $0.70 per diluted share, on revenue of $1.45 billion for the same period in the prior year.

26.     The Q1 2012 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.     On August 3, 2012, General Cable filed a quarterly report on Form 10-Q with the SEC, subsequently amended on March 1, 2013 and on January 21, 2014, announcing the Company's financial and operating results for the quarter ended June 29, 2012 (the "Q2 2012 10-Q").  For the quarter, General Cable reported net income of $17.80 million, or $0.35 per diluted share, on revenue of $1.45 billion, compared to net income of $37.6 million, or $0.68 per diluted share, on revenue of $1.53 billion for the same period in the prior year.

28.     The Q2 2012 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.     On March 1, 2013, General Cable filed a quarterly report on Form 10-Q with the SEC, subsequently amended on March 4, 2013 and on January 21, 2014, announcing the Company's financial and operating results for the quarter ended September 28, 2012 (the "Q3 2012 10-Q").  For the quarter, General Cable reported a net loss of $23.3 million, or $0.46 per diluted share, on revenue of $1.51 billion, compared to a net loss of $2 million, or $0.04 per diluted share, on revenue of $1.52 billion for the same period in the prior year.

30.     The Q3 2012 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     On March 1, 2013, General Cable filed an annual report on Form 10-K with the SEC, subsequently amended on January 21, 2014, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 10-K").

For the quarter, General Cable reported a net loss of $15.7 million, or $0.32 per diluted share, on revenue of $1.62 billion, compared to net income of $4.5 million, or $0.09 per diluted share, on revenue of $1.37 billion for the same period in the prior year.  For 2012, General Cable reported net income of $4.3 million, or $0.08 per diluted share, on revenue of $6.06 billion, compared to net income of $66 million, or $1.2 per diluted share, on revenue of $5.87 billion for 2011.

32.    In the 2012 10-K, General Cable stated, in part:

***Our business is subject to the economic, political and other risks of maintaining facilities and selling products in foreign countries.***

During the year ended December 31, 2012, approximately 61% of our sales and approximately 70% of our assets were in markets outside of North America. Our operations outside of North America generated approximately 52% of our cash flows from operations during this period. Some of our facilities, in particular, certain locations such as Algeria, Angola, Egypt, India, Pakistan, the Philippines, Thailand, and Venezuela, among others, are at higher risk of being targets of economic and political destabilization, international conflicts, restrictive actions by foreign governments, nationalizations or expropriations, changes in regulatory requirements, the difficulty of effectively managing diverse global operations, terrorist activities, adverse foreign tax laws and the threat posed by potential pandemics in countries that do not have the resources necessary to deal with such outbreaks. Our financial results may be adversely affected by the enactment of exchange controls or foreign governmental or regulatory restrictions on the transfer of funds. In addition, negative tax consequences relating to the repatriation of certain foreign income may adversely affect our cash flows. Over time, we intend to continue to expand our foreign operations, which would serve to exacerbate these risks and their potential effect on our business, financial position and results of operations. Economic and political developments in the countries in which we have operations, including future economic changes or crises (such as inflation, currency devaluation or recession), government deadlock, political instability, political activism, terrorist activities, civil strife, international conflicts, changes in laws and regulations and expropriation or nationalization of property or other resources, could impact our operations or the market value of our common stock and have an adverse effect on our business, financial condition and results of operations.

. . .

***Compliance with foreign and U.S. laws and regulations applicable to our international operations, including the Foreign Corrupt Practices Act***

*("FCPA") and other applicable anti-corruption laws, may increase the cost of doing business in international jurisdictions.*

Various laws and regulations associated with our current international operations are complex and increase our cost of doing business. Furthermore, these laws and regulations expose us to fines and penalties if we fail to comply with them. These laws and regulations include import and export requirements, U.S. laws such as the FCPA, and local laws prohibiting payments to governmental officials and other corrupt practices. Although we have implemented policies and procedures designed to ensure compliance with these laws, there can be no assurance that our employees, contractors and agents will not take actions in violation of our policies, particularly as we expand our operations through organic growth and acquisitions. Any such violations could subject us to civil or criminal penalties, including substantial fines or prohibitions on our ability to offer our wire and cable products in one or more countries, and could also materially damage our reputation, brand, international expansion efforts, business and operating results. In addition, if we fail to address the challenges and risks associated with our international expansion and acquisition strategy, we may encounter difficulties implementing our strategy, which could impede our growth or harm our operating results.

33.     The 2012 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

34.     On May 7, 2013, General Cable filed a quarterly report on Form 10-Q with the SEC, subsequently amended on January 21, 2014, announcing the Company's financial and operating results for the quarter ended March 29, 2013 (the "Q1 2013 10-Q").  For the quarter, General Cable reported a net loss of $45.70 million, or $0.92 per diluted share, on revenue of $1.54 billion, compared to net income of $22.8 million, or $0.45 per diluted share, on revenue of $1.43 billion for the same period in the prior year.

35.     The Q1 2013 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.     On January 21, 2014, General Cable filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 28, 2013 (the "Q2 2013 10-Q").  For the quarter, General Cable reported net income of $8.3 million, or $0.16 per diluted share, on revenue of $1.66 billion, compared to net income of $17.8 million, or $0.35 per diluted share, on revenue of $1.48 billion for the same period in the prior year.

37.     The Q2 2013 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

38.     On January 21, 2014, General Cable filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 27, 2013 (the "Q3 2013 10-Q").  For the quarter, General Cable reported net income of $4.9 million, or $0.11 per diluted share, on revenue of $1.56 billion, compared to a net loss of $23.3 million, or $0.46 per diluted share, on revenue of $1.51 billion for the same period in the prior year.

39.     The Q3 2013 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On March 3, 2014, General Cable filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K").  For the quarter, General Cable reported net

income of $13.8 million, or $0.27 per diluted share, on revenue of $1.66 billion, compared to a net loss of $15.7 million, or $0.32 per diluted share, on revenue of $1.62 billion for the same period in the prior year.  For 2013, General Cable reported a net loss of $17.8 million, or $0.37 per diluted share, on revenue of $6.42 billion, compared to net income of $4.3 million, or $0.08 per diluted share, on revenue of $6.06 billion for 2012.

41.     In the 2013 10-K, General Cable stated, in part:

***Our business is subject to the economic, political and other risks of maintaining facilities and selling products in foreign countries.***

During the year ended December 31, 2013, approximately 57% of our sales and approximately 71% of our assets were in markets outside of North America. Our operations outside of North America reported operating cash outflows of approximately $76.8 million during this period. Some of our facilities, in particular, certain locations such as Algeria, Angola, Egypt, India, Pakistan, the Philippines, Thailand, and Venezuela, among others, are at higher risk of being targets of economic and political destabilization, international conflicts, restrictive actions by foreign governments, nationalizations or expropriations, changes in regulatory requirements, the difficulty of effectively managing diverse global operations, terrorist activities, natural disasters, adverse foreign tax laws and the threat posed by potential pandemics in countries that do not have the resources necessary to deal with such outbreaks. Our financial results may be adversely affected by the enactment of exchange controls or foreign governmental or regulatory restrictions on the transfer of funds. In addition, negative tax consequences relating to the repatriation of certain foreign income may adversely affect our cash flows. Over time, we intend to continue to expand our foreign operations, which would serve to exacerbate these risks and their potential effect on our business, financial position and results of operations. Economic and political developments in the countries in which we have operations, including future economic changes or crises (such as inflation, currency devaluation or recession), government deadlock, political instability, political activism, terrorist activities, civil strife, international conflicts, changes in laws and regulations and expropriation or nationalization of property or other resources, could impact our operations or the market value of our common stock and have an adverse effect on our business, financial condition and results of operations.

. . .

***Compliance with foreign and U.S. laws and regulations applicable to our international operations, including the Foreign Corrupt Practices Act***

*("FCPA") and other applicable anti-corruption laws, may increase the cost of doing business in international jurisdictions.*

Various laws and regulations associated with our current international operations are complex and increase our cost of doing business. Furthermore, these laws and regulations expose us to fines and penalties if we fail to comply with them. These laws and regulations include import and export requirements, U.S. laws such as the FCPA, and local laws prohibiting payments to governmental officials and other corrupt practices. Although we have implemented policies and procedures designed to ensure compliance with these laws, there can be no assurance that our employees, contractors and agents will not take actions in violation of our policies, particularly as we expand our operations through organic growth and acquisitions. Any such violations could subject us to civil or criminal penalties, including material fines or prohibitions on our ability to offer our wire and cable products in one or more countries, and could also materially damage our reputation, brand, international expansion efforts, business and operating results. In addition, if we fail to address the challenges and risks associated with our international expansion and acquisition strategy, we may encounter difficulties implementing our strategy, which could impede our growth or harm our operating results.

We are in the process of reviewing certain commission payments made by our subsidiary in Angola. The review is being conducted under the oversight of the Audit Committee of the Board of Directors and with the assistance of external counsel. Due to the ongoing nature of the review, we have not yet been able to determine whether such commission payments were inconsistent with applicable U.S. or international laws and regulations. Based on the information gathered to date, we cannot predict the duration or the outcome of this review. If there is a finding that one or more payments were inconsistent with applicable laws or regulations, we may be subject to monetary or other sanctions, which could be material.

42.     The 2013 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

43.     On May 6, 2014, General Cable filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 28, 2014 (the "Q1 2014 10-Q"). For the quarter, General Cable reported a net loss of $315.4 million, or $6.42 per diluted share, on revenue of $1.43 billion, compared to a net loss of $45.7

million, or $0.92 per diluted share, on revenue of $1.54 billion for the same period in the prior year.

44.     The Q1 2014 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45.     On August 1, 2014, General Cable filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 27, 2014 (the "Q2 2014 10-Q").  For the quarter, General Cable reported a net loss of $24.8 million, or $0.51 per diluted share, on revenue of $1.39 billion, compared to net income of $8.3 million, or $0.16 per diluted share, on revenue of $1.66 billion for the same period in the prior year.

46.     The Q2 2014 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.     The statements referenced in ¶¶ 22-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) General Cable paid millions of dollars in bribes to government officials in foreign countries, including Angola, Bangladesh, China, Egypt, Indonesia, India, and Thailand, in order to secure business; (ii) the foregoing conduct was in violation of the FCPA; (iii) General Cable's revenues were therefore in part the product of illegal conduct, and, as such, subject to disgorgement and

unlikely to be sustainable; (iv) the foregoing conduct, when it became known, would subject the Company to significant regulatory scrutiny and financial penalties; and (v) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

### The Truth Begins To Emerge

48.    On September 22, 2014, General Cable disclosed that the Company was reviewing "payment practices," "the use of agents," and "the manner in which the payments were reflected on our books and records" in connection with General Cable's operations in Portugal, Angola, Thailand, and India.  General Cable advised investors that these issues "may have implications under" the Foreign Corrupt Practices Act.

49.    On this news, General Cable's share price fell $0.93, or 4.68%, to close at $18.96 on September 22, 2014.

50.    On November 3, 2014, General Cable filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 26, 2014 (the "Q3 2014 10-Q").  For the quarter, General Cable reported a net loss of $124.2 million, or $2.55 per diluted share, on revenue of $1.32 billion, compared to net income of $4.9 million, or $0.11 per diluted share, on revenue of $1.56 billion for the same period in the prior year.

51.    The Q3 2014 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

52.     On February 25, 2015, General Cable announced that in connection with a possible settlement of FCPA offenses, the Company expected to disgorge $24 million in profits from bribe-tainted sales in Angola.

53.     On March 2, 2015, General Cable filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K").  For the quarter, General Cable reported a net loss of $163.2 million, or $3.35 per diluted share, on revenue of $1.38 billion, compared to net income of $13.8 million, or $0.27 per diluted share, on revenue of $1.66 billion for the same period in the prior year.  For 2014, General Cable reported a net loss of $627.6 million, or $12.86 per diluted share, on revenue of $5.39 billion, compared to a net loss of $17.8 million, or $0.37 per diluted share, on revenue of $6.42 billion for 2013.

54.     In the 2014 10-K, General Cable stated, in part:

***Our business is subject to the economic, political and other risks of maintaining facilities and selling products in foreign countries.***

During the year ended December 31, 2014, approximately 57% of our sales and approximately 64% of our assets were in markets outside of North America. Our operations outside of North America reported operating cash inflows of approximately $40.2 million during this period. Some of our facilities, in particular, certain locations such as Algeria, Angola, Egypt, India, Pakistan, Thailand, and Venezuela, among others, are at higher risk of being targets of economic and political destabilization, international conflicts, restrictive actions by foreign governments, nationalizations or expropriations, changes in regulatory requirements, the difficulty of effectively managing diverse global operations, terrorist activities, natural disasters, adverse foreign tax laws and the threat posed by potential pandemics in countries that do not have the resources necessary to deal with such outbreaks. Our financial results may be adversely affected by the enactment of exchange controls or foreign governmental or regulatory restrictions on the transfer of funds. In addition, negative tax consequences relating to the repatriation of certain foreign income may adversely affect our cash flows. Over time, we may continue to expand our foreign operations, which would serve to exacerbate these risks and their potential effect on our business, financial position and results of operations. Economic and political developments in the countries in which we have operations, including future economic changes or crises (such as

inflation, currency devaluation or recession), government deadlock, political instability, political activism, terrorist activities, civil strife, international conflicts, changes in laws and regulations and expropriation or nationalization of property or other resources, could impact our operations or the market value of our common stock and have an adverse effect on our business, financial condition and results of operations.

. . .

***Compliance with foreign and U.S. laws and regulations applicable to our international operations, including the Foreign Corrupt Practices Act ("FCPA"), other applicable anti-corruption laws and anti-competition regulations, may increase the cost of doing business in international jurisdictions.***

Various laws and regulations associated with our current international operations are complex and increase our cost of doing business. Furthermore, these laws and regulations expose us to fines and penalties if we fail to comply with them. These laws and regulations include import and export requirements, anti-competition regulations, U.S. laws such as the FCPA, and local laws prohibiting payments to governmental officials and other corrupt practices. Although we have implemented policies and procedures designed to ensure compliance with these laws, there can be no assurance that our employees, contractors and agents will not take actions in violation of our policies, particularly as we expand our operations through organic growth and acquisitions. Any such violations could subject us to civil or criminal penalties, including material fines or prohibitions on our ability to offer our wire and cable products in one or more countries, and could also materially damage our reputation, brand, international expansion efforts, business and operating results. In addition, if we fail to address the challenges and risks associated with our international expansion and acquisition strategy, we may encounter difficulties implementing this strategy, which could impede our growth or harm our operating results.

We have been reviewing, with the assistance of external counsel, certain commission payments involving sales to customers of our subsidiary in Angola. The review has focused upon payment practices with respect to employees of public utility companies, use of agents in connection with such payment practices, and the manner in which the payments were reflected in our books and records. We have determined at this time that certain employees in our Portugal and Angola subsidiaries directly and indirectly made or directed payments at various times from 2002 through 2013 to officials of Angola government-owned public utilities that raise concerns under the FCPA and possibly under the laws of other jurisdictions. Based on an analysis completed with the assistance of our external counsel and forensic accountants, we have concluded at this time,that we are able to reasonably estimate the profit derived from sales made to the Angolan government-owned public utilities in connection with the payments described

above which we believe is likely to ultimately be disgorged. As a result, we have recorded an estimated charge in the amount of $24 million as an accrual as of December 31, 2014. The accrued amount reflects the probable and estimable amount of the Angola-related profits that the Company believes is subject to being disgorged, and does not include any provision for any fines, civil or criminal penalties, or other relief, any or all of which could be substantial. We also have been reviewing, with the assistance of external counsel, our use and payment of agents in connection with our Thailand and India operations, which may have implications under the FCPA. We have voluntarily disclosed these matters to the SEC and the United States Department of Justice ("DOJ") and have provided them with additional information at their request, including information in response to an SEC subpoena. The SEC and DOJ inquiries into these matters are ongoing. We continue to cooperate with the DOJ and the SEC with respect to these matters. We are implementing a screening process relating to sales agents that we use outside of the United States, including, among other things, a review of the agreements under which they were retained and a risk-based assessment of such agents to determine the scope of due diligence measures to be performed by a third-party investigative firm. However, this screening process may not be effective in preventing future payments or other activities that may raise concerns under the FCPA or other laws. We also have provided anti-corruption training to our global sales force, and ultimately will provide such training to all salaried employees. In addition, we have hired a Chief Compliance Officer, who is responsible for the day-to-day management of our compliance function. The Chief Compliance Officer reports to our Chief Executive Officer, and also has a reporting relationship with the Audit Committee.

At this time, we are unable to predict the nature of any action that may be taken by the DOJ or SEC or any remedies these agencies may pursue as a result of such actions. Any determination that our operations or activities are not in compliance with existing laws or regulations could result in the imposition of substantial fines, civil and criminal penalties, and equitable remedies, including disgorgement and injunctive relief. Because our review regarding commission payment practices and our use and payment of agents described above is ongoing, we are unable to predict its duration, scope, results, or consequences. Dispositions of these types of matters can result in modifications to business practices and compliance programs, and in some cases the appointment of a monitor to review future business and practices with the objective of effecting compliance with the FCPA and other applicable laws.

55.    The 2014 10-K contained signed certifications pursuant to SOX by the Individual

Defendants, stating that the financial information contained in the 2014 10-K was accurate and

disclosed any material changes to the Company's internal control over financial reporting.

56.     On May 11, 2015, General Cable filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended April 3, 2015 (the "Q1 2015 10-Q"). For the quarter, General Cable reported a net loss of $38.1 million, or $0.78 per diluted share, on revenue of $1.17 billion, compared to a net loss of $315.4 million, or $6.42 per diluted share, on revenue of $1.43 billion for the same period in the prior year.

57.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58.     On August 10, 2015, General Cable filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended July 3, 2015 (the "Q2 2015 10-Q"). For the quarter, General Cable reported a net loss of $6.9 million, or $0.14 per diluted share, on revenue of $1.11 billion, compared to a net loss of $24.8 million, or $0.51 per diluted share, on revenue of $1.39 billion for the same period in the prior year.

59.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

60.     On November 9, 2015, General Cable filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended October 2, 2015 (the "Q3 2015 10-Q"). For the quarter, General Cable reported a net loss of $29 million, or $0.59 per diluted share, on revenue of $1.1 billion, compared to a net loss of $124.2

million, or $2.55 per diluted share, on revenue of $1.32 billion for the same period in the prior year.

61.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

62.     The statements referenced in ¶¶ 50-51 and 52-61 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) General Cable paid millions of dollars in bribes to government officials in foreign countries, including Angola, Bangladesh, China, Egypt, Indonesia, and Thailand, in order to secure business; (ii) the foregoing conduct was in violation of the FCPA; (iii) General Cable's revenues were therefore in part the product of illegal conduct, and, as such, subject to disgorgement and unlikely to be sustainable; (iv) the foregoing conduct, when it became known, would subject the Company to significant regulatory scrutiny and financial penalties; and (v) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

63.     On February 10, 2016, post-market, General Cable reported that the Company had increased its disgorgement accrual for the potential FCPA settlement by $9 million to $33 million, after identifying "certain other transactions that may raise concerns".

64.     On this news, General Cable's share price fell $3.05, or 31.61%, to close at $6.60 on February 11, 2016.

65.    On December 29, 2016, The *Wall Street Journal* reported that General Cable had entered into a non-prosecution agreement with the U.S. Department of Justice, in which the Company "agreed to pay $75.8 million to settle allegations it paid bribes across Africa and Asia and . . . agreed to an additional $6.5 million penalty to settle accounting-related violations." The article further stated that the Company's subsidiaries, "over a period of a dozen years, paid about $13 million to third-party agents and distributors," who in turn "paid bribes to government officials in Angola, Bangladesh, China, Indonesia and Thailand to get business in violation of the Foreign Corrupt Practices Act."

66.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired General Cable securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, General Cable securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by General Cable or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of General Cable;

- whether the Individual Defendants caused General Cable to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of General Cable securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- General Cable securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold General Cable securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

74.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I
### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

77.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of General Cable securities; and (iii) cause Plaintiff and other members of the Class to purchase General Cable securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

78.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for General Cable securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about General Cable's revenues and business practices.

79.     By virtue of their positions at General Cable, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

80.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of General Cable, the Individual Defendants had knowledge of the details of General Cable internal affairs.

81.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of General Cable.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to General Cable's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of General Cable securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning General Cable's business and financial condition which were concealed by Defendants, Plaintiff and the other

members of the Class purchased General Cable securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

82.     During the Class Period, General Cable securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of General Cable securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of General Cable securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of General Cable securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

83.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

85.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.    During the Class Period, the Individual Defendants participated in the operation and management of General Cable, and conducted and participated, directly and indirectly, in the conduct of General Cable's business affairs.  Because of their senior positions, they knew the adverse non-public information about General Cable's revenues and business practices.

87.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to General Cable's financial condition and results of operations, and to correct promptly any public statements issued by General Cable which had become materially false or misleading.

88.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which General Cable disseminated in the marketplace during the Class Period concerning General Cable's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause General Cable to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of General Cable within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of General Cable securities.

89.    Each of the Individual Defendants, therefore, acted as a controlling person of General Cable.  By reason of their senior management positions and/or being directors of

General Cable, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, General Cable to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of General Cable and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

90.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by General Cable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 5, 2017                    Respectfully submitted,
                                          **POMERANTZ LLP**

                                          */s/ Jeremy Lieberman*
                                          Jeremy A. Lieberman
                                          J. Alexander Hood II
                                          Hui M. Chang

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
E-mail: jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _Satish Doshi_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against General Cable Corporation ("General Cable" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire General Cable securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired General Cable securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in General Cable securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


Executed   _December 30, 2016_
           **(Date)**


_Satish Doshi_
           **(Signature)**

Satish Doshi
           **(Type or Print Name)**

**GENERAL CABLE CORPORATION (BGC)**                                    **Doshi, Satish**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 8/15/2014 | Purchase | 1,000 | $20.0700 |